morning your honors my name is Richard Eisenberg I represent Dennis Sherry the appellant in this matter may please the court we respectfully suggest that the district court relied on two specific erroneous filings in reaching the decision from November 2 2015 which we appeal from at this time first the subject of the foreclosure and receivership operated at a substantial loss and we believe this clearly colored the district courts review of the other relevant facts in the case. Could you actually clarify that for me I mean are you talking about ongoing expenditures putting the capital expenditures aside or what are we talking about? The quote appears at special appendix at page 14 your honor and it is the simple statement that the I know the district court said that but I wasn't clear based on the very sketchy data and information about operating costs and revenues and so on what the actual finances were and whether that was or whether you know any opposition to that conclusion or endorsement of the conclusion took capital expenditures which is significant into account or not we believe the district judge made a mistake in this regard your honor the best evidence of what was going on globally with regard to the operation of the property appears at appendix 118 that is an exhibit with a summary of financial operations during the pendency of the foreclosure and that exhibit was next to Mr. Sherry's original motion for commissions and if I just may make one or two points you will see that the income cash receipts was within a certain range during the 29 months of the receivership with the exception of four months in June and July of 2012 October 2012 and January 2013 those months represented the substantial infusions of cash from the servicing agent to fund the capital improvements which were a major part of Mr. Sherry's obligations during the receivership. Where are the expenses related to those infusions reflected? Those expenses would show in the next column bank statement disbursements they would not be month-for-month equivalents for the reason that and this is a in detail in the record for the reason that these projects were progress billed that is to say over a period of many months the contractors involved billed roughly three million dollars and as you would see in the bank disbursement category there were a series of months where there were very substantial disbursements and months then which taper off. So it included the capital expenditures insofar as they were made here but this also included that was deferred maintenance and the property was not in good condition and it was then sold for two hundred fifty thousand dollars but I couldn't tell if that was a good deal or a terrible deal. Our point your at A118 it is clear that the building with the exception of the capital improvement plan was self-sustaining taking all the testimony into account with the exception of the capital improvement plan I mean that's not broken out in this exhibit A118. Regrettably it's not broken out in this exhibit and with respect the district judge compounded the issue by simply concluding that the building operated at a substantial loss but there was no claim and no testimony that the special servicer acting as the agent of the then lender advanced any money at all for the operations of the building it only advanced monies to support the approved capital improvement plan. So our position is in judging what Mr. Sherry did and whether or not in totality his work was beneficial and sustaining for the property our position is he stabilized the property and he made itself sustaining with the exception of the capital improvements which he requested improvement for. What about the district court's findings that Mr. Sherry authorized certain payments to employees of CBRE who were supposed to be already covered by the fixed fee. In fact the district court found that there was double payment to some of these employees. That was a conclusion of the district court. First we would say that in large part the expenditures which were the subject of the district court's discussion were explicitly allowed and I refer the court to appendix A26. These are factual findings that the district court made and so we're on clear error review? We're suggesting that on the points we're raising at this time despite the fact that a clear and extensive record was developed the district judge made a couple of important errors in the understanding of Mr. Sherry's efforts. I would note that in the . . . You had a chance to file after . . . There was a hearing first of all, right? Yes, Your Honor. Two days? Correct. How many witnesses? Two witnesses, our receiver Mr. Sherry and the gentleman who was the project manager for the capital plan and capital projects described in the record. And then after that you had a chance to file post-hearing findings of fact, conclusions of law. It was a rather extensive process here, right? That's true, Your Honor. We do not suggest that we did not have an opportunity to brief this. We're just focusing on the areas where we believe despite the development of a complete record these one or two misunderstandings resulted in an erroneous order. And what exactly did the district court overlook then in its analysis of the purportedly duplicative fees? I would just . . . Yeah, go ahead. Just note in the first a paragraph on record 826. Midway down it says, among other powers, and to employ an agent to rent and collect the rents of the premises and to pay the reasonable value of such agent services out of the rents received. The record indicates that a very large part of the sums expended to the temporary employees on site included rent collection and Mr. Sherry had the express right to hire such a person and pay such a person out of the cash flow received from rents. We respectfully submit that the court erred in confusing to a certain extent the project, the property management fees charged pursuant to subsidiary court order to do the banking, bank reconciliations, accounting as distinct from the rent collection matter, and to the extent that the appellee is saying this is the key reason why Mr. Sherry should be completely denied any compensation for 29 months of work, we suggest that he acted in good faith and there was clearly a reason to decide the other way in his favor even after an extensive fact-finding hearing. I'd like to speak very briefly to the issue raised, the other key issue raised by the court was Mr. Sherry's conduct with regard to the negotiating and extension of the Winthrop Hospital lease. We suggest very strongly in our brief and we have cases to support that under the circumstances showed in the factual hearing the court pursuant to applicable New York case law should have ratified those activities, they benefited the entire property, they have benefited the appellee who has been receiving enhanced rents on an extended lease and we believe that the appellee's only motivation with regard to the disputed facts on Winthrop Hospital is to punish Mr. Sherry and deny him a commission despite the fact that the entire record shows he did an excellent job in enhancing and preserving that rental stream for the benefit of the property and now for the benefit of the current owner of the appellee. And with respect to the Winthrop Hospital renegotiation there was no obligation that he go back to the court for approval unlike in the Ambrosino contract and so on, is that what you're saying? First he has the right to conduct rental operations that's in the originating. You're saying he had no obligation. The only issue where we say there was a valid critique was whether or not he should have gone to the court, to the district court expressly to get approval for the aspect of the lease which committed the rents to the repayment of the landlord improvement work which was a key part of the Winthrop Hospital deal and in that case we are suggesting that given the equities, given the value added to the property, given the value added to the acquiring entity, the appellee, that those events if he neglected to get that request specifically from the court should have been ratified by the court. It benefited and continues to benefit. This is a matter of the court's discretion though right? We agree. Thank you. Thank you. Thank you, Your Honors. I may have pleased the court, Chris Costello for Ellis Equities. Before I delve into what I was going to say, I want to take a couple seconds here to respond to what Mr. Eisenberg just mentioned. Could I just ask a point of information? Sure. So is Ellis Equities related to CBRE, C.B. Richard Ellis? No. Ellis Equities is the note holder. They purchased the note and then were the ones that ended up an affiliate. I know the role is different but because the name was the same, I wonder if there was any, it's different. Okay, thank you. So there's a reason that Mr. Eisenberg is raising now the issue of operating at a substantial loss. It wasn't raised below. It was never addressed with Judge Saborg and there's a reason for that because even I went back and looked at it and if you add up all the operating statements, they come out $880,000 in the hole. So I would have raised that if we had raised this issue below because it's an obviously an obvious incorrect statement that the property operated at a profit. It didn't. The court made a finding in that regard though, right? She found that it was operating at a loss and that included the fact that there had been this capital expenditures but they never raised the fact that the property had made a profit. Oh, they never did. Below. Right. It was sort of understood that it had always been at a loss based on it, if nothing else, the 3.1 million that CW Capital had to put into the property. Now, part of the reason that we're all here involved in all this is that the reports weren't filed on time, right? And so delving into this took more time over time as you went into all of the records. I would submit that none of that is relevant to this court because this is about an abuse of discretion, right? It's without question that Judge Saborg had the discretion to make the award that she did. Under CPLR, she has the discretion to award nothing to 5% or to if there is indeed 29 months of work and there is lots of work and it produces results, wouldn't it be an abuse of discretion? No, it wouldn't. And the reason the reason that it's a receiver provided valuable services. Well, Your Honor, if we're talking about a normal context, I would agree with you. It has to be. I'm not talking. You're suggesting that a district court or a what must be reasonable, a reasonable exercise of this. It has to be within the permissible decisions that are allowed under the law. She has a permissible decision to award nothing depending on the circumstances. All I'm saying is it wouldn't be nothing if indeed it would be an abuse of discretion if valuable service were in fact provided. And I understand your position is that no valuable services were provided. Actually, I'm trying on that isn't the position, but I think you have to take the you're saying that a court has absolute discretion to imposed to award nothing. The court has the discretion to make an award of a commission based on the circumstances in front of it and that those circumstances could be zero. Those circumstances could lead to a search of a receiver. It doesn't have to be a reasonable exercise of discretion. I think it's implicit in it to say that you're going to understand and analyze the circumstances and make a reasonable decision under the permissible one. But there's no question here that her decision was reasonable. I was just reacting to what you had said before, what seemed like a gross overstatement to suggest that a court has absolute discretion to award nothing, even if valuable services are provided. Well, I provided and there are no other circumstances that lead to the court to conclude that it was appropriate not to award a commission, then I would agree with you. The court would not be able to award zero in those circumstances. Here, I think we're a little different, right here. But before I go further, I want to just make it clear, because that's not the only thing that wasn't raised below, right? The comment where Mr. Eisenberg was referring to a 26 about going back to the receiver order to discuss whether or not the work of the property administrator, the third party, right, was covered under this provision of the receiver order was never raised below either, right? And that was partially because this was all discovered and discussed at the hearing, right? And so we're stuck with the situation. And Your Honor hit this right on the head when we talked first, which was, that's $455,000 that was charged to the property for services that were supposed to have been provided under the property management agreement. Mr. Sherry testified that he knew that he was supposed to get the court's approval and he didn't, right? And that's just, it's all part of this pattern of him knowing what he was supposed to do and then not doing it. And that involves not only the project management, where he hired CBRE to do it without the court's approval, again hiring and paying $455,000 to the property on-site administrator and the temporary, sorry, the property on-site manager and the property administrator, and then entering into the Ambrosino contract. There is no dispute here that the Winthrop lease extension was within the receiver's authority, but that's not the issue. And I would submit that the decision that the receiver acted outside of his authority, entering into the Ambrosino contract, is not even properly before this court. It was decided by Judge Siebert on a motion that was raised by Mr. Ambrosino when he sued the receiver. She found that it was outside of his authority. He was acting outside of his authority when he entered into it. That was done on that motion with Mr. Ambrosino and the third party present, and it's never been appealed from. So that's not even properly before this court. What we're really doing here today is to say, did Judge Siebert properly exercise her discretion when, based on everything that she heard, she determined that Mr. Sherry was not entitled to a commission? And I would suggest that she did. And in fact, the abuse so that the So what are the key elements that take this outside of the paradigm that you and Judge Chin were discussing, in which services are rendered and then no payment is made? Sure. We have, so here, we have a property manager that was already appointed for a flat fee, and that's been paid. We have a decision to award work to a property on-site manager and a third party who would have been doing, admittedly, would have been doing the work of CBRE. They were hired specifically so that CBRE did not have to hire another employee. So that would be, and he admitted that they would be doing the same work that would have been done under the property management contract. That's $455,000 that was charged to the property. The judge correctly found that you don't get reimbursed for that, right? So she could have surcharged Mr. Sherry the entire $455,000 that he paid. She decided in her discretion not to do that, right? So you have that. That had not been appropriately reported either, right? It had not been appropriately, right. So when you were looking at Exhibit O, which was A118 in the record, Judge Siebert had found, and Mr. Sherry had admitted that he had not disclosed those amounts that were paid to CBRE on this exhibit. Are there more factors you've listed? Yes, there were. So there's that. There's the fact that he didn't file the reports on time. He didn't file his monthly reports, and that was important not only for the fact that he has a court order, but because people like Ellis Equities, who would have bought the note, would have wanted to be able to evaluate the receivership. The court could have been managing what was going on. You have the Ambrosino contract. You have the property management contract. So in the property management contract, it's awarded to CBRE without competitive bidding, right? And it was originally a $90,000 not to exceed contract, okay? Again, without court approval. He comes back. They have to increase it for another $36,000. He doesn't go back to get the approval. But I think on top of all of that, you have a lack of candor with the court, right? You have a lack of candor about what was paid to CBRE. You have a lack of candor about when he knew who the new note holder was, right? You have a lack of candor. But wasn't he entitled at least to the $70,000 instead of he paid it over, bringing the receiver's balance down to zero? But that, in fact, was cash left in the account. That was cash that was in the account, but that cash had already been earmarked for the other expenses that were still out there. So it wasn't really left in the account. So we're back to, again, just putting all this back, we're back to, again, a situation where there isn't money in the account. There's certainly not money in the account for the commission he was seeking. So you go back to 804B under the CPLR, which means you need to show special circumstances, right? And so in order to go beyond and to figure that out, you have to get to that point. I would suggest that it's the lack of candor with the court, plus the other failures to follow the orders, plus the burdening of the property with an additional $455,000 that really leads her, right, altogether, plus to the fact that he's not entitled to a commission. And your Honors hit it right on the nail on the fact that this was a multi-tiered process. He makes the first application. The court says, well, thank you very much for your narrative summaries, but I really need you to file all the data, all the monthly reports. He files the monthly reports. He says, well, you know, I've looked at this, I've looked at the property history, I've seen how it all worked, but I need you now to come back and talk about what are the things that you did on your individual basis. And this goes back, I'm sorry, it goes back to the other point, which was the receiver couldn't identify what he did vis-a-vis what CBRE did and what others did. He had a real problem figuring that out. So if you go through that, he then has the – she has the hearing, he's able to put on whatever evidence he wants. I cross-examine him. I get him to admit that he's made mistakes, that he hasn't been entirely truthful. You're out of time, actually. And then – Why don't you finish up? Sure. I just – I would suggest that Judge Siebert made the right decision, and this is going to be analyzed under the abuse of discretion standard, which is a high burden for them to prove. They haven't met it, and I would suggest – I would submit that we just affirm Judge Siebert's ruling. Thank you. Thank you. We'll hear the rebuttal. Two quick points. First, the – on K-118, the balance on hand was a surplus, approximately $71,500. Did you raise the issue below? Counsel says the issue was never raised in front of Judge Siebert. It was briefed on the original motions filed extensively prior to the hearing, and we submit that's all part of the record that the judge had before her, not merely the two days of testimony. We made clear that we transmitted the $71,500 in hand early in an effort to make sure there was a smooth and rapid transition. I'm hearing for the first time that there were allegedly other commitments for that money. There's nothing in the record, I suggest to you, that tells us where there were other commitments. That was money that constituted a surplus from the operations of this receivership. This receivership had a small balance outstanding in its favor at the time Mr. Sherry's receivership was terminated. Finally and lastly, Mr. Sherry has said, with regard to the reports, he has acknowledged that he neglected to physically file them on a monthly basis with the court, but the testimony and his declarations on the motion indicate clearly the reports were promptly and regularly created. They were delivered to the original servicer, C.W. Capitol, and the best proof of that – the best proof of that is that all the 29 reports were delivered to the district court's chambers one week after she issued her order requiring them. It would have been impossible to suggest that these were not being completed, that they were not done on a regular basis, and still prepare them in one week and deliver 2,400 pages of reports to the judge. I won't take files. Mr. Sherry has acknowledged the ministerial error. The question is whether or not he should be denied any compensation. The ministerial error meaning he didn't file the reports with the judge as he was supposed to. That is correct. That is correct. His position is the work was done, the reports were done, the special servicer acting for the lender received what it was entitled to, and he neglected to file them. When he was directed to do so, they were all there in hand and available, and one week later they were delivered to chambers. So the point we are making is whether or not those facts would support a decision to completely eliminate any compensation for a receiver who otherwise performed extensively for a two-and-a-half-year period. We suggest that he is entitled to a fair compensation on his request. Thank you, Your Honor. Thank you. We will reserve decision.